In the Matter of CRAIG COAL MINING COMPANY, INC., Debtor.

Robert G. SABLE, Trustee for Craig Coal Mining Company, Inc., Plaintiff,

v.

GLOBAL AUCTIONEERS, INC. and Joe Bailey & Sons, the Auctioneers, Defendants.

Bankruptcy No. 81–2259.
Adv. No. 82–2540.

United States Bankruptcy Court, W.D. Pennsylvania.

Aug. 11, 1983.

Mark Glosser, Pittsburgh, Pa., for trustee.

Mary Reitmeyer, Pittsburgh, Pa., for defendant.

## MEMORANDUM OPINION

GERALD K. GIBSON, Bankruptcy Judge.

The matter presently before the Court is Trustee's Complaint for Turnover of Monies wherein Trustee alleges that sale proceeds retained by defendant auctioneer were in excess of those specified in the written auction agreement as later modified by the parties. Among the contract modifications alleged by Trustee in the dispute at bar are those pertaining to the following: auctioneer's commissions; limitation upon auctioneer's expenditures for preparation of sale items; and proration of advertising expenses among the various participants in the auction. Trustee also alleges a subsequent agreement with agent of the defendant for the repair of equipment prior to sale.

Trustee, in part, bases his complaint upon the apparent authority of defendant's agent to modify and supplement the written agreement between Trustee and defendant. Defendant argues that Trustee knew or should have known that its agent did not have the authority to bind defendant by subsequent oral agreement with Trustee, nor did agent have the authority to alter the written agreement.

After careful consideration of the testimony offered at trial, the Court enters the following Findings of Fact. In August, 1981, Craig Coal Mining Company filed a voluntary petition under Chapter 11 of the Bankruptcy Code. Thereafter, in March, 1982, the Court entered an order authorizing Trustee to retain Global Auctioneers, defendant herein, to conduct a sale of debtor's equipment and machinery. Prior negotiations between Tex Boyles, agent of defendant, and Trustee had resulted in an agreement entitled "Consignment Contract", admitted into evidence as Plaintiff's Exhibit A. The standard agreement was signed by Tex Boyles on behalf of Global Auctioneers, Inc. Therein, Boyles had struck the provision which provided that Owner pay Auctioneer a commission of 10%

of gross receipts from sale of consigned property. In place of the 10% figure, Boyles had inserted "6%" in handwriting. However, the agreement was unsatisfactory to the Trustee, for it contained no limitation upon various auction expenses. For that reason, the Trustee never signed or returned the agreement.

Thereafter, Trustee and counsel for primary secured creditor, Irving Leasing Corporation, hereinafter "Irving" entered into further negotiations with Joe Bailey, President of Global Auctioneers. A subsequent agreement was drafted by Trustee and forwarded to both Joe Bailey and Tex Boyles on February 3, 1982. Prior to Joe Bailey's return of the signed agreement, Bailey and Trustee reached certain agreements in a telephone conversation which took place on February 11, 1982. Therein, the parties agreed that the auctioneer would not receive a commission on equipment bid in by Irving, provided that the auctioneer was guaranteed a minimum commission of $20,000.

The auction agreement, signed by Joe Bailey and Trustee, provided in pertinent part as follows:

1. Auctioneer agrees that it will hold a public auction of various items of equipment, including but not limited to those items listed on Exhibit A.[1]

The contract further provided as follows:

4. The parties agree that auctioneer shall take all steps necessary for preparation of the equipment for sale at the auction site or advertising or promotion of the auction sale. Auctioneer is authorized to spend a sum not in excess of $10,000 for advertising and promotion of said sale, and a sum not in excess of $20,000 for delivery and preparation of equipment for the sale.

The following handwritten notation was made upon the auction agreement by Joe Bailey prior to his signing the same: "prep-

aration to mean cleaning, painting and decals."

Subsection 5 provided as follows:

5. Trustee agrees to pay auctioneer a commission of 6% of the gross receipts of sale, provided, however, in no event shall auctioneer's commission be *more* than $20,000. (emphasis added).

The last phrase was modified by Joe Bailey as follows. The word "more" was struck, and the word "less" was inserted above it. This modification was consistent with the prior oral agreement between Bailey and the Trustee to the effect that no commission was due upon equipment bid in by Irving, as long as the auctioneer was guaranteed a minimum commission of $20,000.

The contract contained no further provisions concerning payment of auctioneer's commission on equipment bid in by Irving; establishment of a minimum upset bid to protect Irving's interest; or advertising. Nor did the contract contain any provision concerning auctioneer's commission upon equipment sold by Trustee to a third party prior to the auction. Additionally, the contract contained no provisions with regard to repair of the equipment, for at that time, no repairs were contemplated by the parties.

On February 21, 1982 Joe Bailey returned the signed agreement with the aforementioned handwritten changes to Trustee. The auction agreement was approved by the Court on March 11, 1982. Shortly thereafter, Trustee advised Bailey by letter that the handwritten changes were satisfactory.

Trustee testified that all initial contacts were with Joe Bailey, and consisted of phone calls between the parties upon five separate occasions. However, Trustee's final conversation with Bailey occurred on March 4, 1982; and the last written communication from Bailey was the return of the signed auction agreement. Thereafter, all

---

1. Included among the items listed on Exhibit A was a Davey Drill M8B Drill S/N M8A–1230 Ford Truck mounted with attachments, as is condition, cleaned and painted.

communication with Global regarding the auction of Debtor's assets were with Tex Boyles, Global's agent who arrived at the auction site in Somerset, Pennsylvania upon Bailey's instruction. Trustee testified that during one of the conversations with Bailey, Bailey advised Trustee that he would be working with Tex Boyles from that point forward. Thereafter, Tex Boyles on behalf of Global, participated in all further negotiations and oversaw all arrangements for the auction. Bailey testified that Boyles had the authority to find sellers, make appraisals, make mechanical reports, and do repairs. Further, Bailey testified that Boyles had the authority to enter into contracts binding Global under certain circumstances. Bailey never advised Trustee of any limitations upon Boyle's authority, nor was there any language in the written contract indicating that any changes thereto were subject to the approval of the home office.

Initially, Trustee did not consider the need for repairs to the equipment prior to sale. However, in mid-March, some months prior to the auction, Trustee reconsidered the issue of repairs with a view toward obtaining the highest possible sale price. All negotiations with regard thereto took place with Boyles. By letter dated April 28, 1982 on the letterhead of Joe Bailey and Sons Auctioneers, Boyles submitted to Trustee a handwritten estimate of repairs accompanied by a cover letter signed by Tex Boyles on behalf of Joe Bailey and Sons Auctioneers. The estimate contained therein was $30,000–$35,000. Trustee typed the estimate and forwarded it to counsel for Irving on May 20, 1982. Shortly thereafter, on May 26, 1982, Trustee instructed Boyles by telegram not to make any expenditures for repairs.

On June 4, 1982 Trustee met with Boyles in Somerset, Pennsylvania. At that meeting, Trustee and Boyles agreed that Trustee would seek Court permission for repairs subject to the approval of Irving. At that time Boyles informed Trustee that equipment from P.B.S. Coals, Inc. and N.M.S. Coal Company, Limited were to be included in the auction. Copies of the consignment

contracts between P.B.S. and Global; and N.M.S. and Global were admitted into evidence as Plaintiff's Exhibits M and N, respectively. Both contracts were signed by Tex Boyles on behalf of Global Auctioneers.

Thereafter, Trustee forwarded a letter dated June 7, 1982 to Boyles in Somerset. The notation at the end of the letter indicates that it was carbon-copied to Joe Bailey and counsel for Irving. The letter provides in part as follows:

In accordance with the discussion at our meeting in Somerset on June 4, 1982, this is to confirm our understanding.

1. I will file a petition with the Bankruptcy Court authorizing the expenditure of funds for the repairs requested in your recent memorandum to me. This authorization will be subject to the Court's discretion and any objections by Irving Leasing. Although I will advance a portion of the funds immediately upon Court approval, it must be understood that we will receive an itemized statement for all repairs, including receipts for any purchases . . .

The letter further provided:

5. It is my understanding that other equipment is being included in the sale . . . and that any common expenses of sale, including advertising, will be prorated among persons having equipment in the sale.

Although a copy of the letter was sent to Joe Bailey, there was no response thereto. The Court is satisfied that Bailey received the letter.

On June 16, 1982, counsel for Irving advised Trustee by letter that it would not approve items 3–12, as appear on Plaintiff's Exhibit I, until an independent investigation was made into the need for such repairs.

Thereafter, on July 1, 1982 Trustee and counsel for Irving met with Boyles for purposes of determining which repairs were authorized by Irving. The parties also discussed the $20,000 limitation upon auctioneer's expenditures for cleaning, painting and transportation contained in the written

auction agreement. At that time, the parties orally agreed to change the limit from $20,000 to $10,000.

A letter written by counsel for Irving to Trustee, dated July 6, 1982 sets forth the understanding reached by the parties at the July 1, 1982 meeting, and states as follows:

"This letter will confirm the agreements reached between you as Trustee, Tex Boyles of Global Auctioneers, and (Jacob Ross, counsel for Irving) on behalf of Irving Leasing Corporation at our meeting on July 1, 1982 concerning the Estimate and Breakdown on repairs needed on Craig Coal equipment submitted by Global ... Transportation, cleaning and painting of the equipment shall be no more than $10,000 and receipts will be supplied. Advertising shall be no more than $10,000 and receipts will be supplied.

The letter further stated:

The following itemization is the cost agreed upon at the meeting for parts and labor as opposed to the cost submitted in the original *estimate.*

The letter contained a detailed itemization of those repairs which were authorized by Irving and Trustee at the July 1, 1982 meeting. The total amount of repairs authorized at the meeting and as set forth in the letter was $20,461 in addition to those repairs which had already been performed. The terms of the agreement as set forth in the July 6, 1982 letter were corroborated at trial by Trustee and counsel for Irving.

Prior to July 1, 1982, Trustee had advanced funds to Boyles and his designees for repairs in the amount of $6652.09. Thereafter, Trustee advanced the additional amount of $19,862 to Boyles for repairs. Total funds advanced to Boyles for repairs were in the amount of $26,514.09.

On July 6, 1982 Trustee forwarded a copy of the Irving letter to Boyles, at which time he indicated that it adequately reflected the understanding of the parties.

Trustee testified that all negotiations with regard to the subject of repairs took place with Boyles. Boyles advised Trustee

that repairs could be performed more cheaply by hiring day labor and using used parts. Bailey testified that in late June, he spoke with the Trustee by telephone, at which time they agreed that because of the delay in completion of the repairs, Global would provide its own mechanic, Don Droney, at a cost of $28 per hour. However, Trustee testified that his last conversation with Bailey took place on March 4, 1982. After consideration of testimony offered at trial, the court is satisfied that there was no agreement between Trustee and Bailey for use of Global's mechanic at $28 per hour.

Don Droney testified that he was at the auction site in Somerset from the period commencing July 4, and ending July 28, 1982 for purposes of repairing equipment of Craig Coal. He spent a total of 203 hours, and was paid $620 every two weeks for his services, plus reimbursement of out of pocket expenses.

The auction took place on July 23, 1982. At the auction, Irving bid in a Komatsu Loader and a Michigan Loader for a combined purchase price of $57,000. Further, some months prior to the sale, Trustee secured a buyer for the Davey Drill previously mentioned as having appeared on Exhibit A of the original contract. The sale price was $77,000 and the sale was confirmed by order of court. Trustee testified that he had informed Boyles of the sale of the Davey Drill and they had agreed that no commission would be charged by Global on the same.

The total gross proceeds from the July 23, 1982 sale of Craig Coal equipment and machinery were $397,270.00, which includes the $57,000 for equipment bid in by Irving. The Consignor's Settlement Sheet sets forth the following: a total of $28,456 was charged for commissions. Included in that figure is $4620, which reflects a 6% commission on the sale of the Davey Drill for $77,000. Also included in that amount is $3420, which reflects a 6% commission on the equipment bid in by Irving for $57,000. The Consignor's Settlement Sheet further indicates as follows: the total deducted by Global for cleaning, painting and transpor-

tation was $14,700. The Court also finds that prior to the auction Trustee had advanced the amount of $3678.13 for transportation. Thus the total amount for cleaning, painting and transportation was $18,378.13; or $8,378.13 in excess of the $10,000 maximum for cleaning, painting and transportation as agreed to by Trustee, agent Boyles and counsel for Irving on July 1, 1982.

As indicated on the Consignor's Settlement Sheet, Global deducted the amount of $10,000 from gross sale proceeds for advertising; and $14,949.57 for mechanical repairs. Global's total advertising costs for the July 23 auction were $15,489.98.

In its brief, plaintiff argues that the corporate defendant's agent had the express, implied or apparent authority to enter into agreements with the Trustee authorizing secured lender to bid its collateral at the public auction sale without paying an auctioneer's commission; authorizing a fixed dollar amount to be set for repairs of equipment to be sold; and authorizing a change in the original dollar limit set for cleaning, painting and transportation charges.

In response thereto, defendant denies any knowledge of the meeting between Trustee and Boyles regarding repair of the equipment and modification of the auction agreement. Defendant further denies any agreement to prorate advertising expenses or to reduce the maximum charges for cleaning, painting and transportation. Defendant argues that plaintiff knew or should have known that Boyles did not have the authority to bind the defendant by oral agreement, or to alter the written auction agreement. While defendant admits that the commission upon the equipment bid in by Irving was charged in error, it denies any agreement exempting the Davey Drill sold to a third party by Trustee prior to the auction from auctioneer's commission.

The Court now turns to the case law related to the dispute at bar. The liability of a principal for acts of its agent rests upon (1) express authority (2) implied authority (3) apparent authority or (4) authority by estoppel. *Apex Financial Corp. v.*

*Decker,* 245 Pa.Super. 439, 369 A.2d 483 (1976).

Apparent authority is the power to bind a principal which the principal has not actually granted but which he leads persons with whom his agent deals to believe that he has granted to the agent. The test for such is whether a man of ordinary prudence, diligence and discretion would have a right to believe and would actually believe that the agent possessed the authority he purported to exercise. *Apex, supra,* 369 A.2d p. 486.

Where the agent has authority to exercise discretion, the exercise thereof will bind the principal. *Nuzum v. Spriggs,* 357 Pa. 531, 55 A.2d 402 (1947). Even if in violation of the principal's instructions, the agent's acts will bind the principal if within the scope of authority which principal has permitted agent to possess. *Edwards v. Heralds of Liberty,* 263 Pa. 548, 107 A. 324 (1919).

In the case at bar, the court is satisfied that agent Boyles was clothed with the apparent authority to modify and alter the written auction agreement as follows. Per agreement of Boyles and Trustee, no commission was to be charged upon the Davey Drill, sold by Trustee to third party for $77,000 prior to the auction. Further, the $20,000 maximum for cleaning, painting and transportation of equipment and machinery as set forth in the written auction agreement was changed to $10,000 during the July 1, 1982 meeting between Boyles, Trustee and counsel for Irving. At that time, parties also agreed that all additional repairs would not exceed the sum of $20,461, in addition to the amount of $6652.09 previously advanced by Trustee for the same. Additionally, at the meeting on June 4, 1982 between Boyles and Trustee in Somerset, it was agreed that the advertising expenses associated with the auction would be prorated between Debtor, N.M.S. Coal Company, Limited and P.B.S. Coals, Inc.

In the case at bar there is also ample evidence to support the finding of authority by estoppel. As stated in *Apex, supra*:

Authority by estoppel occurs when a principal by his culpable negligence, permits an agent to exercise powers not granted to him, even though the principal did not know or have notice of the agent's conduct. In the event that a principal fails to take reasonable steps to safeguard himself and to safeguard third persons dealing with an agent from harm caused by the agent, then the principal may be estopped from denying the authority of the agent. (369 A.2d p. 486).

Based upon the foregoing, the Court concludes that Trustee is entitled to the return of $4620 for commission charged upon the Davey Drill. Further, per stipulation of the parties, Trustee is entitled to the return of $3420 for commission erroneously charged upon the equipment bid in by Irving.

With regard to repairs, the amount of $20,461 was authorized at the July 1, 1982 meeting in addition to the amount of $6652.09 advanced by the Trustee to Boyles prior thereto. Therefore, the total amount authorized by Irving and Trustee for repairs was $27,113.09. Trustee has advanced the sum of $26,514.09 for repairs. On the Consignor's Settlement Sheet, Trustee was charged an additional $14,949.57 for repairs. Trustee is entitled to return of $14,350.57 for repairs; said sum representing $14,949.57 less the amount of $599. The latter figure represents the difference between the total amount authorized for repairs and the total amount advanced by Trustee for repairs.

With regard to the cleaning, painting and transportation of the equipment; the amount of $14,700 was deducted from sale proceeds by Global, as indicated on the Consignor's Settlement Sheet. Further, Trustee had advanced the amount of $3678.13 for transportation prior to the auction. Trustee is entitled to the return of $8378.13, which is the amount by which total expenditures for cleaning, painting and transportation exceeded the $10,000 maximum agreed to by the parties on July 1, 1982.

With regard to advertising, Global's total advertising expenses for the auction were $15,489.98. Total gross proceeds from the sale of equipment of the debtor and others were $625,295. Total sale proceeds attributable to sale of debtor's equipment, excluding the items bid in by Irving were $340,270; or 54.4% of the total sale. Thus fifty-four point four percent of $15,489.98 is $8426.54. On the Consignor's Settlement Sheet, Trustee was charged $10,000, and is therefore entitled to the return of the $1573.46 overcharge for advertising.

Based upon the foregoing, Trustee is entitled to the return of $32,342.16.

